827 So.2d 429 (2002)
Curtis ROBICHEAUX, et al.
v.
Camran G. ADLY, et al.
No. 02-37.
Court of Appeal of Louisiana, Third Circuit.
June 12, 2002.
Opinion on Rehearing October 9, 2002.
*431 C. Benjamin Landry, L. Clayton Burgess, Lafayette, LA, for Plaintiffs-Appellants, Curtis Robicheaux, et al.
Nicholas Gachassin, III, Thomas H. Morrow, Gachassin Law Firm, Lafayette, LA, for Defendant-Appellee: Morris Lahasky Nursing Home.
Nicholas J. Sigur, Broussard, LA, for Defendant-Appellee: American Legion Hospital.
Burleigh Doga, Crowley, LA, for Defendant-Appellee: Camran G. Adly, M.D.
Court composed of NED E. DOUCET, JR., C.J., ULYSSES GENE THIBODEAUX and SYLVIA R. COOKS, Judges.
THIBODEAUX, Judge.
In this wrongful death/survival action, Curtis Robicheaux (Curtis), on behalf of his deceased wife, Judy Robicheaux, and as natural tutor of their minor child, Kisha, and the major children of Judy, Kelvin, Kirk and Kasey, appeal the trial court judgment in favor of the Defendants, Dr. Camran G. Adly,[1] Morris Lahasky Nursing Home, and the American Legion Hospital *432 d/b/a the Pauline Faulk Centre, finding that the Defendants were not at fault for the wrongful death of their wife and mother, Judy. Curtis and his children claim that the defendants violated the Medical Malpractice Act and the Patient's Bill of Rights. With respect to Dr. Adley and the Pauline Faulk Centre, the plaintiffs assert that the trial court erred in finding that they did not violate the Health Care Quality Improvement Act and did not commit negligence under La.Civ.Code art. 2315. With respect to the Lahasky Nursing Home, plaintiffs assert that the trial court erred in finding that its actions in failing to administer routine medical care did not cause Judy's wrongful death pursuant to La.Civ.Code art. 2315.1, did not violate La.R.S. 28:171 by its use of both chemical and physical restraints, did not commit medical battery upon Judy and did not commit negligence in the hiring or supervision of Dr. Adly.
After review of the evidence, with respect to the jury's conclusion that the defendant Pauline Faulk Centre and defendant Dr. Adly did not commit medical malpractice, violate the Patient's Bill of Rights, violate the Health Care Quality Improvement Act, commit negligence or breach of contract in the treatment of the decedent, we find no error. With the exception of the jury's negligence finding against defendant Lahasky Nursing Home, we find likewise.

I.

ISSUES
Plaintiffs assert the following as the issues on appeal:
(1). whether the jury committed an abuse of discretion in failing to find by a preponderance of the evidence that the defendants committed errors in their treatment, administration of treatment of decedent, Judy Robicheaux and whether the errors were a substantial factor or cause of her wrongful death in accordance with La.C.C. Art. 2315.1(2);
(2). whether the care rendered by the defendants was below the standard of care found under La.R.S. 40:1299.1 (Medical Malpractice), a violation of La.R.S. 28:171 regarding the use of chemical and/or physical restraints, a violation of the Health Care Quality Improvement Act, 42 USCA § 11101 and 11401;
(3). whether the care was negligent under La.C.C. Art. 2315, constituted breach of contract by the defendants, constituted battery and/or negligent hiring and/or supervision.

II.

FACTS
Beginning in June of 1995 and ending on December 6, 1995, the date of decedent's death, Judy was hospitalized at the Pauline Faulk Centre, and the Lahasky Nursing Home for treatment of bulbar-amyotrophic lateral sclerosis (bulbar-ALS) also known as "Lou Gehrig's Disease" which was diagnosed in August 1995 at Abbeville General Hospital by two neurologists, Drs. Fabian Lugo and Leo deAlvare. The plaintiffs assert that Dr. Adly mistakenly admitted Judy to the Pauline Faulk Centre under a diagnosis of schizophrenia and treated her for that alleged illness. Dr. deAlvare noted Judy's progressive bulbar dysfunction. Dr. deAlvare further recommended that comfort measures be taken, that the family consider a "do not resuscitate" status and a discussion of the progressive nature of the illness with the family as well as the *433 grim prognosis and high likelihood of ventilatory failure.
This case involves Judy's treatment beginning on August 18, 1995 when she was admitted into the Lahasky Nursing Home, then discharged from the nursing home on September 28, 1995 and admitted to the Pauline Faulk Centre on that same day. On November 10, 1995, Judy was discharged from the Pauline Faulk Centre and readmitted to the Lahasky Nursing Home. On December 1, 1995 while a resident at the nursing home, Judy was found in her room with her eyes completely dilated, unresponsive and cyanotic. Due to her condition, she was transferred to Abbeville General Hospital. Upon being admitted to Abbeville General Hospital, Judy was put on a ventilator. On December 6, 1995, Judy was pronounced dead at the hospital.
It is undisputed that the decedent, Judy, suffered with bulbar-ALS. There is also no dispute that due to her bulbar-ALS, Judy suffered with dysphagia, or difficulty swallowing. The doctors are also in agreement that the progression of Judy's bulbar-ALS would render Judy unable to swallow or breathe and would eventually lead to her death as there is no cure for ALS. Upon her discharge from the Pauline Faulk Centre and readmission to the Lahasky Nursing Home on November 10, 1995, instructions were provided to the nursing home stating that Judy was to be suctioned due to her swallowing problems. The Lahasky Nursing Home admits that it did not suction Judy from the time she was admitted in November until she was taken to Abbeville General Hospital on December 1, 1995, in accordance with the Pauline Faulk Centre's discharge instructions for Judy's care.
The parties dispute the cause of Judy's death. Plaintiffs' experts concluded that Judy's death was caused by aspiration pneumonia that led to adult respiratory distress syndrome (ARDS) and was caused, in part, by the nursing home's failure to suction Judy. Dr. Darvin Hales, a pulmonologist, explained that aspiration occurred in Judy's case when the fluid in her mouth drained into her lungs due to her inability to swallow. Dr. Hales also explained that aspiration pneumonia occurs when oral fluid, usually filled with bacteria, gets into the lungs. On the other hand, defendants' main witness, Dr. Carlos A. Garcia, a neurologist and pathologist, testified that Judy's death came about as a natural result of the progression of the bulbar-ALS. Dr. Garcia explained that patients with bulbar-ALS lose respiratory function as the disease progresses and develop hyaline membranes in their lungs that compromises the patient's ability to use the muscles that bring air in and out of their lungs to breathe.
Plaintiffs also claim that Dr. Adly wrongfully treated Judy by prescribing controlled substances when he did not have a drug enforcement agency (DEA) license to do so, and that those drugs caused an increase in Judy's oral secretions. Plaintiffs also claim that the Pauline Faulk Centre knew of Dr. Adly's questionable qualifications to treat and prescribe medicine and yet allowed Dr. Adly to treat Judy.
On February 11, 1998, the medical review panel exonerated the Pauline Faulk Centre. Meanwhile, on August 16, 1996, plaintiffs filed a petition against defendants seeking damages for the death of their wife/mother, Judy. A jury trial was had in this matter from April 30, 2001 through May 4, 2001. At the conclusion of the trial, the jury found in favor of defendants on all of plaintiffs' claims. It is from this decision that the plaintiffs appeal.

III.

STANDARD OF REVIEW
"An appellate court generally reviews the factual findings of a trial court *434 according to the manifest error standard of review. This standard applies equally in jury trials and judge trials." Powell v. Regional Transit Authority, 96-0715, p. 4 (La.6/18/97); 695 So.2d 1326, 1328. The standard has best been stated in Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989):
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. (Citations omitted.)
. . . .
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings, for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. (Citations omitted.) Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. (Citations omitted.) But where such factors are not present, and a fact finder's finding is based upon its decisions to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. (Citations omitted.)
"The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).

IV.

LAW AND DISCUSSION

Medical Malpractice ActLa.R.S. 40:1299.41, et seq.
The plaintiffs contend that the defendants violated the Medical Malpractice Act (MMA) by treating the decedent in a manner that is below the standard of care found in the Act. In particular, plaintiffs contend that Dr. Adly was not licensed to dispense the drugs he prescribed for the decedent. Further, plaintiffs contend that the Pauline Faulk Centre should not have allowed Dr. Adly to practice in the hospital. Plaintiffs contend that Lahasky Nursing Home did not follow the Pauline Faulk Centre's discharge instructions to suction the decedent's oral secretions and therefore caused the decedent to suffering and subsequent death.
Defendant, Pauline Faulk Centre, contends that the plaintiffs do not complain that its treatment of Judy was substandard but that the physician who treated Judy at Pauline Faulk Centre, Dr. Adly, was not licensed to do so, that the Pauline Faulk Centre knew Dr. Adly was not licensed to treat patients and that Dr. Adly unlawfully prescribed certain controlled dangerous substances in his treatment of Judy. The Pauline Faulk Centre contends that Dr. Adly was licensed to treat patients, that his prescribing of the drugs used to treat Judy was not in violation of the law and did not harm Judy. Thus, the Pauline Faulk Centre asserts that the jury *435 was correct in finding that the plaintiffs failed to prove that any acts or failures to act on the part of the hospital or Dr. Adly were the proximate cause of Judy's death.
Likewise, Lahasky Nursing Home contends it did not violate the standard of care in its treatment of Judy. Lahasky asserts that bulbar-ALS is a "terrible and fatal disease" with no "known cure or treatment." Lahasky Nursing Home essentially argues that plaintiffs failed to prove that its treatment of Judy, or lack thereof, caused Judy to suffer and subsequently die as opposed to the natural progression of Judy's disease.
Louisiana Revised Statutes 9:2794[2] provides for a plaintiff's burden of proof in a medical malpractice action against various healthcare providers. The plaintiff must prove the physician's alleged negligence by a preponderance of the evidence. Injury alone does not raise a presumption that the physician was negligent. La.R.S. 9:2794(C). See Pitre v. Opelousas Gen. Hosp., 530 So.2d 1151 (La.1988). This court stated in Charpentier v. Lammico Ins. Co., 606 So.2d 83, 87 (La.App. 3 Cir.1992):
The law does not require perfection in medical diagnoses and treatment. On the contrary, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. Broadway v. St. Paul Insurance Co., 582 So.2d 1368 (La.App. 2d Cir.1991), and the cases cited therein. *436 Further, in a medical malpractice action against a hospital under the theory of respondeat superior, the standard of care and burden of proof is the same as for a physician whose activities are questioned. Corley v. State, Dept. of Health & Hospitals, 32,613 (La.App. 2 Cir. 12/30/99), 749 So.2d 926; McCraw v. Louisiana State University Medical Center, 627 So.2d 767 (La.App. 2 Cir.1993), writ denied, 94-0001 (La.3/11/94), 634 So.2d 399.
A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case.
Hunt v. Bogalusa Comm. Med. Ctr., 303 So.2d 745, 747 (La.1974).
As stated above, one of the plaintiffs' claims against the hospital is that it committed malpractice by allowing Dr. Adly to prescribe schedule IV drugs to the decedent even though Dr. Adly surrendered his Drug Enforcement Agency (DEA) license in Massachusetts prior to coming to Louisiana to practice medicine. Dr. Adly's DEA license allowed him to prescribe schedule IV drugs. However, as the Pauline Faulk Centre asserted and as the trial court correctly instructed, 21 U.S.C.A. § 822(c)(1), has an exception to the DEA registration requirement with respect to schedule IV drugs that allows "an agent or employee of any registered manufacturer, distributor, or dispenser of any controlled substance or list I chemical if such agent or employee is acting in the usual course of his business or employment." As there was no evidence in the record that Dr. Adly was not employed by the Pauline Faulk Centre or that he acted outside of the course and scope of his employment with the Pauline Faulk Centre or that the Pauline Faulk Centre was not a "registered distributor, or dispenser of any controlled substance," there was no error in the jury's conclusion that the Pauline Faulk Centre did not commit medical malpractice due to the actions of Dr. Adly in prescribing controlled substances to the decedent.
Further, plaintiffs' contention that the Pauline Faulk Centre committed malpractice because Dr. Adly was allowed to treat patients under a suspended medical practice license is likewise without merit. The parties filed into evidence a joint exhibit consisting of a letter from the "Louisiana State Board of Medical Examiners" to the "American Legion Hospital" dated November 29, 1995, regarding Dr. Adly. The letter stated the following:
Please be advised that the Final Decision rendered by the Louisiana State Board of Medical Examiners in the matter of Camran Ghaffari Adley, M.D. dated October 6, 1995, has been stayed pending appeal for a period of 120 days from December 1, 1995, by order of the Court. Therefore, Camran Ghaffari Adley, M.D. has full, unrestricted license to practice medicine in the state of Louisiana until further notice of the Board.
There was no evidence presented by the plaintiffs that Dr. Adly was not licensed to practice medicine in Louisiana. Thus, we find no error in the jury's conclusion that Dr. Adly had the skill and knowledge to treat Judy, and used reasonable care and diligence along with his best judgment in the application of his skill and knowledge during his treatment of Judy. Further, we find that the jury did not err in finding *437 that Dr. Adly was lawfully practicing medicine while treating the decedent.
Upon her discharge from the Pauline Faulk Centre and admission to the Lahasky Nursing Home, Judy was taking the following drugs prescribed by Dr. Adly: Osmolite, Doxepin (sometimes sold under the brand name Ativan), Lithium, and Periactin. Further, while Judy was a patient at the Pauline Faulk Centre, Dr. Adly prescribed Phenobarbital, Ativan and Risperdal. Plaintiffs claim that these drugs should not have been prescribed to Judy because the effect of the drugs was to increase her oral secretions which exacerbated Judy's swallowing problem. However, Dr. James Anderson, who testified on behalf of the plaintiffs, stated that the drugs she was prescribed upon her discharge from the Pauline Faulk Centre and admission to the Lahasky Nursing Home, actually caused "anticholonergic" or "dry mouth." Dr. Anderson testified that the Risperdal prescribed to Judy while a patient at the Pauline Faulk Centre causes increased salivation in only 2% of the people who take it. He further testified that Judy's medical records show that prior to her admission to the Lahasky Nursing Home, she was taken off of the Risperdal, and that while a patient at the Pauline Faulk Centre, she was properly suctioned. Thus, we find no error in the jury's finding that the Pauline Faulk Centre through its employee, Dr. Adly, did not commit medical malpractice or caused harm to the decedent.
With respect to plaintiffs' claims of medical malpractice against the Lahasky Nursing Home, for the reasons stated above with respect to the hospital defendant, we find that the jury did not commit manifest error in concluding that the nursing home did not commit medical malpractice.

Patient's Bill of Rights La.R.S. 40:2010.8(9)
Plaintiffs contend that the Pauline Faulk Centre and the Lahasky Nursing Home violated the decedent's rights while she was a patient at their facilities. Louisiana Revised Statutes 40:2010.8(9) provides as follows with respect to how a nursing home is to treat its patients:
The right to be treated courteously, fairly, and with the fullest measure of dignity and to receive a written statement and oral explanations of the services provided by the home, including statements and explanations required to be offered on an as-needed basis.
The first paragraph provides that the Patient's Bill of Rights is applicable to residents of nursing homes. La.R.S. 40:2010.8(A). Louisiana Revised Statutes 40:2010.8(C) provides that the nursing home is "not responsible for the actions or inactions of other persons or entities not employed by the facility, such as the resident's treating physician, pharmacists, sitter, or other such persons or entities employed or selected by the resident or his sponsor." Thus, it is clear that the hospital cannot be held liable for any breach of La.R.S. 40:2010.8 since it is not a nursing home. Further, the nursing home cannot be held liable for a breach of La.R.S. 40:2010.8 due to any actions of Dr. Adly while Judy was a resident of the nursing home since the record reveals that he was not an employee of the nursing home, and was hired by the plaintiffs to take care of Judy while she was a resident of the nursing home.
Plaintiffs assert that Judy was unlawfully restrained while she was a resident of Lahasky Nursing Home. However, the record reveals that Judy was found outside of the nursing home facility about 40-50 times a day causing the nursing home *438 employees to find her and bring her back to the facility. Thus, it appears that the medical and physical restraints were necessary. Curtis Robicheaux testified that he gave permission for the nursing home to use physical restraints so that Judy "wouldn't pull the [PEG] tube out of her stomach." The record reveals that Judy was physically restrained during her first admission to the nursing home from August 18, 1995 through August 25, 1995, a period of seven days. After that seven day period, Judy was restrained using a "wander guard," a device attached to the wrist that notifies the nursing home personnel if a resident leaves the premises, to which Curtis Robicheaux agreed. Curtis Robicheaux testified that restraints, other than the "wander guard" were not necessary. On the other hand, Judy's nursing home medical records reveal that Judy was able to bypass the security of the "wander guard" and escape to the parking lot of the nursing home where she would be found sitting in cars similar to that of her husband, Curtis. Thus, the nursing home concluded that she needed additional restraints. Curtis Robicheaux testified that there was nothing wrong with the "wander guards" but that the nursing home employees failed to keep a proper look out for Judy which allowed her escapes.
The jury had a choice to believe Curtis' testimony that the restraints put on Judy were used improperly and that Judy was improperly monitored, or the nursing home records to the contrary. Plaintiffs' expert witness on nursing home administration admitted that he was unfamiliar with Louisiana's law with regard to the use of physical restraints and that his entire opinion was based upon what he was told by plaintiffs. We find no error in the jury's choice to discredit the testimony of Curtis Robicheaux with respect to the nursing home's use of physical restraints on Judy. Likewise, we find no error in the jury's obvious choice to discredit Curtis Robicheaux's testimony that Judy was also being chemically restrained while a resident at the nursing home. Plaintiffs' expert, Mr. Youles, admitted that chemical restraint is defined by how a medication is used as opposed to the type of medication used. There is no evidence in the record that the medications prescribed to Judy at the Lahasky Nursing Home were prescribed to be used as chemical restraints.
Plaintiffs also claim that the Lahasky Nursing Home violated the decedent's rights while she was a resident in that it failed to properly take care of her hygiene needs. Plaintiffs' claim that Judy was left lying in her own feces and urine during her second admission to the Lahasky Nursing Home. This claim by plaintiffs was raised in their "Second Supplemental And Amending Petition" filed March 8, 2001, approximately five years after the original petition was filed. There is no evidence in the record that Curtis, Judy's husband, complained about how the nursing home staff took care of Judy's hygiene needs even though he was given a copy of the nursing home residents' rights and the ombudsman's name and phone number at the time of her admission and even though he made other complaints regarding his wife's treatment at the home. Curtis Robicheaux explained his failure to report the problem by testifying, "My wife never received a bump on her head from the Morris Lahasky Home."
Kasey and Kisha Robicheaux, Judy's son and daughter, and Malcolm and Cindy Trahan, her brother and sister-in-law testified as eyewitnesses to Judy's hygiene issues while a resident at the Lahasky Nursing Home. Kasey testified that he found his mother lying in her own feces on many occasions during her second admission to the Lahasky Nursing Home. However, the *439 jury heard testimony that Kasey did not believe his mother had ALS or that she died as a result of the disease and that he never talked to any of her doctors or the pathologists regarding her diagnosis of ALS. Kisha Robicheaux testified that she and her father, Curtis would find her mother lying in her own feces when they visited her at the Lahasky Nursing Home. However, Curtis testified that he did not see his wife, Judy, lying in feces while she was a resident at the Lahasky Nursing Home, thus contradicting Kisha's testimony.
Mr. Trahan and his wife testified that they visited with Judy at the nursing home two days before she was found unresponsive. Mr. Trahan further testified that when he arrived, Judy "couldn't hardly breathe. She was gurgling and mucus was coming out of her mouth, and she was full of fedus [sic]." Mr. Trahan testified that he meant feces when he said "fedus." With respect to the feces, Mr. Trahan testified that Judy's feces was all over her fingernails, her legs and the walls of her room. He further testified that he saw that she had trouble swallowing and that she just jumped out of her bed and "threw up all over the floor." He testified that Judy was getting purple and that he attempted to help her by raising her hands over her head. Mr. Trahan said that he notified the nurses of his sister's condition, but nothing was done to help her, and that an hour after he contacted the nurses he left even though the nurses failed to do anything about his complaints. Mr. Trahan testified that he left because "that's their [nursing home staff's] responsibility." Essentially, Mr. Trahan's testimony is that he left his sister, choking, gurgling, turning purple and covered in her own feces because it was not his job. Obviously, the jury found his testimony incredible with respect to the conditions in which Judy was kept while at the nursing home.
Further, Cindy Trahan testified that she found Judy in the same condition as testified to by her husband. However, her testimony contradicts that of Mr. Trahan, in that Mrs. Trahan testified that she and her husband visited with Judy on the night before Judy was found unresponsive, whereas Mr. Trahan testified that they visited with her two nights before she was found unresponsive. Mrs. Trahan testified that Judy's son Kasey was also present during this visit. However, Mr. Trahan testified that Kasey left earlier in the evening before his arrival. More telling, however, is that Kasey testified that he did not visit his mother the last two days that she was at the nursing home. Due to the inconsistencies in the above testimony, it is apparent that the jury chose to disbelieve Mr. and Mrs. Trahan and Kisha and Kasey Robicheaux's testimony regarding the hygiene care given to Judy while she was a resident of the Lahasky Nursing Home. With the jury in the best position to judge the credibility of these witnesses, we find no error in the jury's choice to disbelieve the Trahans and the Robicheauxs on this issue.

Negligence, Wrongful Death and Survival ActionLa.Civ.Code arts. 2315, 2315.1, 2315.2
The basis of plaintiffs' negligence, wrongful death and survival actions is that the employees of the Lahasky Nursing Home failed to suction Judy during her second admission to the nursing home after her discharge from the Pauline Faulk Centre, even though her discharge papers stated that she was to be suctioned. Plaintiffs assert that the nursing home's failure to suction Judy is what eventually caused her to suffer and die. Lahasky Nursing Home admits that during Judy's second stay at the nursing home, its employees did not suction Judy for twenty *440 days. Dr. Hales testified that the failure to suction a patient with swallowing problems such as Judy, "heightens the risk of... suffocation" and that the "purpose of suctioning is to prevent the suffocation and aspiration" of material into the lungs.
On December 1, 1995, Judy was found in her room with her eyes fixed and dilated, unresponsive and cyanotic. She was transferred to Abbeville General Hospital for emergency care. Dr. Hales testified that at the time of her transfer to the hospital for emergency treatment, Judy "had had a near cardio-pulmonary arrest." Dr. Hales further testified that Judy was admitted with a chest x-ray that identified "right lower lobe pneumonia, probably secondary; most likely secondary to aspiration pneumonia." Upon being admitted to the hospital, Judy was immediately suctioned. Thereafter Judy was "maintained... for somewhere from three to five days on the ventilator, and developed progression of that pneumonia." Dr. Hales explained that as the pneumonia progressed, she developed ARDS. Dr. Hales testified that as a pulmonologist, he is unaware of any condition where a person is "ambulatory" days before trying to "spit up what she was aspirating on, that suddenly fills the lungs from inside up" and causes that person to die. Thus, in Dr. Hales' opinion, Judy died of aspiration pneumonia as opposed to respiratory failure caused by the progression of her bulbar-ALS, which could have been avoided if she had been properly and regularly suctioned while a resident at the nursing home.
Dr. Ronald Lahasky, Judy's treating physician at the nursing home and the nursing home's medical director testified that based on his understanding, Judy died of aspiration pneumonia. Dr. Lahasky explained "aspiration" as follows: "When different types of products, either vomitus or bile or feeding, or whatever goes into your lungs, you have trouble breathing." Dr. Lahasky admitted that one of the ways of combating aspiration is by suctioning the patient. He further admitted that this was not done for Judy.
Defendants' witnesses on the other hand, attribute Judy's death to the natural progression of her bulbar-ALS. Although Dr. Garcia testified that he defers to the expertise of a pulmonologist when assessing problems with a patient's lungs, he qualified his deference by stating it is applicable only when "the patient is alive." Dr. Garcia's opinion was that Judy died as a result of her ALS disease, which caused the aspiration. Dr. Emil M. Laga, a forensic pathologist presented by the defendants, performed a post-mortem autopsy of Judy at the request of the Robicheauxs. He did not review all of the records from the Pauline Faulk Centre nor did he review the medical records from the Lahasky Nursing Home. Further, Dr. Laga reviewed the medical records from Abbeville General Hospital merely to obtain Judy's demographic data. Dr. Laga conducted the autopsy by holding Judy's lungs in his hands. Dr. Laga visually and microscopically inspected her lung tissue for signs of inflammation and bacteria. Further, Dr. Laga cultured the lung tissue to see if any pneumonia-causing bacteria was growing in the lung. Dr. Laga's examination revealed that there were no signs of pneumonia. Dr. Laga testified as follows:
Basically what we saw is an injured lung. It's not an infected lunga lung that had the membranes intact, but functionally they were not intact.
They were injured because of lack of oxygen like all the other organs in the body were partially injured because of lack of oxygen.
. . . .
So we see not an infected lung, not a pneumonia-type of a lung, but a lung *441 that has been chemically injured and lets the fluid that is building up inside the little air sacs and the membrane material that's leaking out into the air sacs through because the membrane, the barrier between the blood and the air sac, has been injured.
Dr. Laga also testified that the injury to the lung is consistent with someone who suffered from bulbar-ALS.
It is clear that the jury chose to believe the opinion of defendants' experts as opposed to the plaintiffs' experts. We do not find clear error in their choice; however, with respect to plaintiffs' survival action against defendant Lahasky Nursing Home, we find that the jury erred. Lahasky Nursing Home admitted that for Judy's last twenty days as a resident at the nursing home, it failed to provide suctioning services as required by her Pauline Faulk Centre discharge documents.
Although it is questionable as to whether Judy eventually succumbed as a result of the progression of her bulbar-ALS, there is no question that suctioning, while she was a resident of the nursing home, was required, and it was not done. This court's decision in Atkinson v. Celotex Corp., 93-924 (La.App. 3 Cir. 3/2/94); 633 So.2d 383 involving the survival/wrongful death actions of several persons affected by asbestos, provides for the award of survival damages even though a defendant may not have been ultimately responsible for a decedent's death. In Atkinson, several heirs of persons exposed to asbestos asserted survival and wrongful death actions. The heirs' decedent relatives died of various types of lung diseases, the cause of which was disputed. On the plaintiffs' side, the experts stated that the causes of the deaths were cancer and asbestosis. However, defendants' experts opined that the causes of the deaths were emphysema and smoking. In plaintiff Clodile Romero's case, this court stated with respect to the jury's finding that his heirs were entitled to survival damages in the amount of $40,000 as follows:
In making its award of survival damages, the jury could have reasonably concluded that Mr. Romero sustained an asbestos related injury to his lungs, but that he died from the effects of cigarette smoking.
Id. at 391.
In the present case, we find that the jury committed clear error in failing to find that Judy did not suffer injury during the twenty days prior to her death while she was a resident at the Lahasky Nursing Home and was not suctioned in accordance with the Pauline Faulk Centre's discharge instructions even though there is dispute as to the cause of her death. In Craven v. Universal Life Ins. Co., 95-1168, pp. 16-17 (La.App. 3 Cir. 3/6/96); 670 So.2d 1358, 1367, writ denied, 96-1332 (La.9/27/96); 679 So.2d 1355, this court stated:
Where a fact finder does not reach an issue because of an "earlier" finding which disposes of the case, the appellate court, in reversing the earlier finding, must make a de novo determination of the undecided issues from the facts in the record. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993); Austin v. Fibrebond Corp., 25,565 (La.App. 2 Cir. 2/23/94), 638 So.2d 1110, writ denied, 94-1326 (La.9/2/94), 643 So.2d 149.
Since we find that the jury erroneously found that Judy was not injured as a result of the Lahasky Nursing Home's failure to suction her during the twenty days prior to her death while she was a resident of the nursing home, the jury never reached the issue of survival damages. Thus, we now undertake a de novo review of that issue.
Damages for a victim's pain and suffering prior to his death are properly awarded in survival action, if there is even a scintilla of evidence of any suffering *442 or pain on part of victim by his actions or otherwise. Prince v. Mattalino, 583 So.2d 541 (La.App. 3 Cir.1991). "In assessing quantum for a decedent's pre-death pain and suffering, the Court must consider both the severity and duration of the injury preceding death." Easton v. Chevron Industries, Inc., 602 So.2d 1032, 1038 (La. App. 4 Cir.), writ denied, 604 So.2d 1315 (La.1992). Our research unveils no case law parallel to this case. There is no instance whereby a patient, with swallowing problems, was discharged to a nursing home with instructions that she be suctioned and where that nursing home failed to do so and where the patient died thereafter. Dr. Hales testified that a person with bulbar-ALS has problems swallowing as well as an inadequate cough reflex which would not allow that person to expectorate fluid from the mouth. He also testified that a bulbar-ALS patient's gag reflex is impaired. Dr. Hales further testified that a person suffering from ALS can not handle their own oral secretions by moving the fluid from the mouth down into the esophagus. Dr. Hales explained that the fluid will just pool in the mouth and ultimately drain into the person's lungs by the force of gravity. Dr. Hales further explained that all fluid in the mouth is contaminated with bacteria. He stated that a person like Judy, who cannot swallow, will gurgle and have drool coming out of their mouth that demands suctioning. In essence, for the twenty days that the staff at the Lahasky Nursing Home failed to suction Judy, she was choking on her own oral secretions. Furthermore, Dr. Hales testified a person in Judy's condition is alert and understands that they are choking and cannot swallow. Dr. Hales further testified that a choking person will do anything to survive such as bending over to let the fluid drain out in an attempt to prevent smothering. Dr. Hales explained that the purpose of suctioning is to prevent suffocation and aspiration of bacteria, fluid, and other materials into the lungs. In a case like this, where Judy essentially choked to near suffocation on her own oral secretions and was aware of her predicament for twenty days, we find that a survival action award in the amount of $100,000 is appropriate.

V.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed insofar as it holds that the Pauline Faulk Centre and the Lahasky Nursing Home did not commit medical malpractice upon Judy Robicheaux and did not violate Judy Robicheaux's rights as a patient. The trial court judgment is reversed and set aside insofar as it holds that the Lahasky Nursing Home used reasonable care and diligence along with its best judgment in the application of its treatment of Judy, in that it failed to follow the hospital discharge instructions to suction Judy. Therefore, we amend the trial court judgment to award the amount of $100,000 to the plaintiffs on their survival action. All costs of this appeal are assessed to the Morris Lahasky Nursing Home.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.

ON REHEARING
We granted rehearing for the sole purpose of delineating more specifically the grounds for the imposition of liability and damages against Lahasky Nursing Home. We buttress our prior opinion issued on June 12, 2002 by again reasserting that Lahasky Nursing Home committed actionable negligence. This actionable negligence which caused damages to Judy Robicheaux falls under the Nursing Home Residents' Bill of Rights, La.R.S. 40:2010.8 A(7)(10).
The section of the June 12, 2002 opinion entitled "Negligence, Wrongful Death and *443 Survival ActionLa.Civ.Code arts. 2315, 2315.1, 2315.2" should have also included "Negligence Under the Residents' Bill of RightsLa.R.S.2010.8(7)(10)."
We conclude that Judy's "right to receive adequate and appropriate health care and protective and support services ..." La.R.S. 40:2010.8 A(7) and her "right to be free from mental and physical abuse ..." La.R.S. 40:2010.8 A(10) were abrogated. Because "[r]esidents [of nursing homes]... have a private right of action to enforce these rights, as set forth in La.R.S. 40:2010.9, we award damages accordingly. Louisiana Revised Statutes 40:2010.9(A) provides nursing home residents with a cause of action for any rights delineated in La.R.S. 40:2010.8. Section B clearly states that these remedies "are in addition to and cumulative with other legal and administrative remedies available to a resident...." Cf. Pender v. Natchitoches Parish Hosp., 01-1380 (La.App. 3 Cir. 5/15/02); 817 So.2d 1239.
In all other respects, the opinion issued on June 12, 2002 remains unchanged.
NOTES
[1] Alternate spelling in the record "Adley."
[2] A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., an optometrist licensed under R.S. 37:1041 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
B. Any party to an action shall have the right to subpoena any physician, dentist, optometrist, or chiropractor for a deposition or testimony for trial, or both, to establish the degree of knowledge or skill possessed or degree of care ordinarily exercised as described in Subsection A of this Section without obtaining the consent of the physician, dentist, optometrist, or chiropractor who is going to be subpoenaed only if that physician, dentist, optometrist, or chiropractor has or possesses special knowledge or experience in the specific medical procedure or process that forms the basis of the action. The fee of the physician, dentist, optometrist, or chiropractor called for deposition or testimony, or both, under this Subsection shall be set by the court.
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician, dentist, optometrist, or chiropractic physician. The jury shall be further instructed that injury alone does not raise a presumption of the physician's, dentist's, optometrist's, or chiropractic physician's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.