STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

13-446

TERRY LEE JOHNSON, SR.

VERSUS

LYNN EDWARD FORET, M.D.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2009-2492
HONORABLE WILFORD D. CARTER, DISTRICT JUDGE

**********

JOHN E. CONERY
JUDGE

**********

Court composed of Billy H. Ezell, James T. Genovese, Shannon J. Gremillion, Phyllis M. Keaty, and John E. Conery, Judges.

REVERSED AND RENDERED.

Gremillion, S., dissents and assigns reasons.

John L. Hammons
Cornell Flournoy
Nelson & Hammons, APLC
705 Milam Street
Shreveport, LA 71101
(318) 227-2401
COUNSEL FOR PLAINTIFF/APPELLANT:
    Terry Lee Johnson, Sr.

**J. Gregory Bergstedt**
**Elizabeth F. Shea**
**Fraser, Wheeler & Bergstedt**
**P. O. Box 4886**
**Lake Charles, LA 70606-4886**
**(337) 478-8595**
**COUNSEL FOR DEFENDANT/ APPELLEE:**
    **Lynn Edward Foret, M.D.**

**CONERY, Judge.**

Terry Lee Johnson, Sr. ("Mr. Johnson") appeals the trial court's judgment that Lynn E. Foret, M.D. ("Dr. Foret"), did not breach the standard of care in his treatment of Mr. Johnson, dismissing his claim against Dr. Foret for medical malpractice. For the following reasons, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Johnson injured or scraped his right knee during Hurricane Rita. It had become infected when he was exposed to dirty water in a local lake. When the infection worsened and became serious, Mr. Johnson sought treatment at a Lake Charles emergency room. In the aftermath of the storm, which caused limited availability of medical care in the Lake Charles area, the E.R. was unable to properly treat Mr. Johnson, and he was evacuated by ambulance to Christus Schumpert Medical Center in Shreveport, Louisiana, where he was diagnosed with a severe abscess and infection of the right knee. The knee was excised, debrided, and drained. Mr. Johnson was placed on antibiotic therapy to treat the infection. He was instructed to return to his physician in Lake Charles for follow up treatment.

On October 16, 2005, some nine days after his discharge from the Shreveport hospital, Mr. Johnson sought care from Dr. Foret due to continued pain and discomfort in his right knee. Dr. Foret confirmed upon examination that Mr. Johnson continued to suffer from a serious infection of the right knee. The next day, Dr. Foret performed a second surgery consisting of irrigation and debridement, with follow up antibiotic treatment.

The infection in Mr. Johnson's right knee persisted. Multiple laboratory studies ordered by Dr. Foret confirmed that Mr. Johnson was suffering from

methicillin resistant staphylococcus aureus ("MRSA"), a severe infection of the right knee which had not resolved. On December 22, 2005, without laboratory evidence that Mr. Johnson's right knee infection had cleared, Dr. Foret performed total right knee replacement surgery, with the insertion of a prosthesis.

After the surgery, Mr. Johnson continued to suffer knee pain and swelling from the MRSA infection, now exacerbated by the placement of a foreign body, the prosthesis, into an infected and septic joint. Mr. Johnson returned to Dr. Foret, who again operated on Mr. Johnson on March 9, 2006, performing an arthrotomy[1] and a bursectomy.[2] The infection persisted.

Dr. Foret performed yet another surgery on May 8, 2006, removing Mr. Johnson's right knee prosthesis. He noted that the infection was still present. Dr. Foret irrigated and scrubbed the knee joint before inserting a methyl-mathacrylate-impregnated spacer. Mr. Johnson was once again placed on continuous home IV antibiotics to be administered via a peripherally inserted central catheter ("PICC line") in his upper arm area. On June 10, 2006, Mr. Johnson returned to the emergency room with complaints of post-operative bleeding. He was continuing to receive antibiotics via a PICC line.

On September 14, 2006, Dr. Foret performed another total right knee replacement with placement of a prosthesis in Mr. Johnson's still infected knee. Post-surgery, Mr. Johnson's knee remained red, swollen, and began draining due to the continuing infection. In response to these complications, on October 17, 2006, Dr. Foret operated on Mr. Johnson's right knee yet again, performing an incision

---

[1] An arthrotomy is an incision into the joint.

[2] A bursectomy is removal of the bursa, a small sac filled with synovial fluid that cushions adjacent structures, usually due to infection.

and drainage. However, he failed to remove the prosthesis and spacer he had placed in Mr. Johnson's still infected knee.

Shortly thereafter, Mr. Johnson was referred by Dr. Foret to Dr. Orlando Schaening, a board-certified infectious disease specialist in Beaumont, Texas. On October 25, 2006, Dr. Schaening examined Mr. Johnson and diagnosed him with a right prosthetic knee infection. He recommended that Mr. Johnson undergo surgery for the removal of the prosthesis followed by treatment for the infection. Mr. Johnson informed Dr. Schaening that he did not wish to return to Dr. Foret for another surgery. At Mr. Johnson's request, Dr. Schaening referred Mr. Johnson to Dr. Ronald E. Talbert, a board-certified orthopedic specialist also in Beaumont, Texas.

Dr. Talbert examined Mr. Johnson on October 26, 2006, and agreed with Dr. Schaening that the infection could not be resolved without removing the second prosthesis. He did so on October 30, 2006. Dr. Talbert, with the assistance of Dr. Schaening, treated Mr. Johnson for four months after the surgery, finally resolving the infection in his right knee. Nevertheless, Mr. Johnson continued to suffer pain and his right knee was unstable.

Dr. Talbert then referred Mr. Johnson to Dr. Daniel Thompson, an orthopedic surgeon specializing in difficult fracture and joint management. Both surgeons recommended that Mr. Johnson undergo a surgical fusion of the right knee because of the damage caused by the previous surgeries. Mr. Johnson agreed, and Dr. Thompson performed a successful surgical fusion of the knee joint. As a result of the right knee fusion, however, Mr. Johnson is now totally and permanently disabled from his former employment as a painter/sandblaster/truck

3

driver. He has incurred $331,562.49 in medical expenses associated with the alleged medical malpractice of Dr. Foret, a sum that is not in dispute.

On March 19, 2007, Mr. Johnson filed a timely claim pursuant to the Louisiana Medical Malpractice Act alleging that despite the overwhelming evidence of active infection in his right knee, Dr. Foret performed a total knee replacement and then magnified his own error by failing to provide appropriate antibiotic therapy and proper post-operative treatment.

A unanimous medical review panel composed of three board-certified orthopedic surgeons concluded that Dr. Foret breached the standard of care and caused Mr. Johnson's damages. The panel opinion stated, "Dr. Foret should not have gone forward with the surgery until the infection was demonstrated to be cleared."

Dr. Foret was a qualified health care provider and was covered by the Louisiana Patients' Compensation Fund ("LPCF"). After the medical evidence was submitted to the LPCF, the fund ultimately settled with Mr. Johnson.[3] Mr. Johnson reserved his right to pursue his damage claims against Dr. Foret, and filed a timely suit on May 21, 2009. Mr. Johnson alleged in his petition that Dr. Foret negligently performed a right total knee replacement, with placement of a prosthesis, without first resolving a severe infection in his knee; that he failed to provide appropriate post-operative treatment, thereby requiring removal of the prosthesis in May 2006; and that he negligently performed a second total knee replacement and inserted another prosthesis in September 2006 while his knee was still infected.

---

[3] The settlement documents were not filed in evidence and hence this opinion does not address any continuing potential claims Mr. Johnson may have for future medical expenses against the LPCF pursuant to La.R.S. 40:1299.43(B)(1)(b).

In December 2010, Mr. Johnson filed a motion for summary judgment arguing that there was no genuine issue of fact that Dr. Foret committed medical malpractice. He introduced the affidavits of the medical review panel who unanimously found that Dr. Foret had failed to adhere to the standard of care, causing Mr. Johnson's damages. The hearing on Mr. Johnson's motion for summary judgment was fixed for May 19, 2011, but was continued without date. A trial on the merits was later rescheduled for May 22, 2012. On May 22, 2012, a pre-trial conference was held in chambers.

The transcript of May 22, 2012 reflects that pursuant to the stipulation of counsel, the parties agreed to and thus submitted the entire case for decision to the trial court based on documentary evidence in lieu of live testimony. After reviewing a post-trial memorandum from Mr. Johnson, the trial court issued written reasons for judgment on August 31, 2012. The trial court found that Dr. Foret did not breach the standard of care in his treatment of Mr. Johnson and issued its judgment on October 10, 2012, dismissing Mr. Johnson's claim with prejudice at his cost. Mr. Johnson timely appealed, assigning four errors.

## ASSIGNMENTS OF ERROR

Mr. Johnson asserts on appeal that:

1. The Trial Court erred in failing to even consider the testimony of Dr. Ronald E. Talbert, appellant's treating orthopedist.

2. The Trial Court erred in failing to even consider the testimony of Dr. William L. Overdyke, a board[-]certified orthopedic surgeon from Shreveport who specializes in joint replacement surgery.

3. The Trial Court erred in failing to consider or even reference the admissions of medical neglect made by Dr. Foret in the medical records themselves.

4. The Trial Court erred in concluding that Dr. Foret complied with applicable medical standards of care in providing treatment to Mr. Johnson.

## DISCUSSION

### *Standard of Review*

In *Virgil v. American Guarantee & Liability Insurance Co.*, 507 So.2d 825 (La.1987), and *Shephard v. Scheeler*, 96-1690 (La. 10/21/97), 701 So.2d 1308, our supreme court held that even when a case is submitted to the trial judge for decision on record evidence only with no live testimony, we are nonetheless obligated to apply the manifest error standard when reviewing the case on appeal. When reviewing a summary judgment, likewise submitted on only record evidence with no live testimony, we are to use the less restrictive de novo standard. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512 (La. 7/5/94), 639 So.2d 730; *Smitko v. Gulf South Shrimp, Inc.*, 11-2566 (La. 7/2/12), 94 So.3d 750.

How do we reconcile the cases using the manifest error standard of review when reviewing cases submitted for trial on documents, affidavits, and depositions with those cases using the de novo standard when considering summary judgments using the same type of evidence? In *Virgil* and *Shephard*, the supreme court attempted to explain by examining the rationale behind the rulings. A trial on the merits requires the trial judge to find the facts. The proper allocation of trial and appellate court functions requires deference to the fact finder. Summary judgments, on the other hand, can only be granted in cases where the material facts are not in dispute, hence no factual findings and no deference is required. *Virgil*, 507 So.2d 825; *Shephard*, 701 So.2d 1308.

Even when applying the manifest error standard, the larger question is how to decide whether the trial court was clearly wrong, how to *apply* the proper

6

allocation of trial and appellate court functions.  In *Virgil* and *Shepherd*, the supreme court emphasized that even though a trial judge may have decided a case on a "cold record," without live testimony that would allow the fact finder to observe demeanor, inflection, tone, and manner of testifying witnesses, appellate courts should none the less accord *great deference* to "the trial court's factual findings, both express and implicit, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court's judgment." *Shephard*, 701 So.2d at 1316.

Immediately after this pronouncement of the standard of review in *Shephard*, the supreme court went on to find that the trial court in that case "clearly erred in finding that the accident was caused by an unreasonably dangerous puddle of standing water[.]" *Id*.  The court reversed a finding of fact made by the trial court and found that it was "clearly erroneous" based on review of all evidence of record. Clearly, *great deference* does not mean *total deference*.

In *Alexandria v. Pellerin Marble & Granite*, 93-1698, p. 1 (La. 1/14/94), 630 So.2d 706, 710, the supreme court re-affirmed *Virgil* and *Shephard's* holding that the manifest error standard applied, even when documentary evidence is used, but then reversed a portion of the judgment of the hearing officer and appellate court, stating:

> We find that the court of appeal did not err by applying the manifest error standard of review. Application of the manifest error standard of review does not however, mandate the affirmance of a lower court decision with respect to findings of fact. When an appellate court finds manifest error, the factual findings of the trier of fact may be reversed.

*See also Magbee v. Federal Exp.*, 12-77 (La.App. 3 Cir. 12/12/12), 105 So.3d 1048 and *Racca v. Acme Truck Lines, Inc.*, 12-1319 (La.App. 3 Cir. 6/12/13), 115 So.3d

1222 (both applying the manifest error standard, but finding that the workers' compensation judge was clearly erroneous). *Great deference* does have its limitations. The appellate court can and must review the facts and the entire record in fulfilling its purpose, role, and function.

### *Burden of Proof – Medical Malpractice Action*

A plaintiff in a medical malpractice action must meet the three-prong burden provided for in La.R.S. 9:2794(A) by proving:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Thus, a ruling in favor of a defendant means that the plaintiff failed to prove that the physician breached the standard of care or that the breach caused injury. "Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong." *Salvant v. State*, 05-2126, p.5 (La. 7/6/06), 935 So.2d 646, 650. If the trial court's decision is based on reasonable factual findings, the trial court's judgment should be affirmed.

8

Following a review of the record and for the reasons stated below, we find that the trial court's decision in this case was not based on reasonable factual findings and was clearly wrong. The trial court erred in its conclusion that Dr. Foret did not breach the standard of care in his treatment of Mr. Johnson, and that the breach did not cause the injuries claimed by Mr. Johnson.

*Assignment of Error One*

Mr. Johnson urges that the trial court erred in failing to consider the testimony of Dr. Ronald E. Talbert, his treating orthopedic surgeon. Mr. Johnson's attorney references medical "reports" of Dr. Talbert dated March 27, 2007, and June 16, 2007, which had been discussed in briefs and argument to the trial and appellate courts without objection. However, the reports, though obviously intended to have been filed in evidence, were not in the record as originally lodged. We remanded this case to the trial court to determine if the referenced reports had been filed in evidence, or should have been submitted into evidence at trial, and if so, to allow the record to be supplemented.

By the time the remand reached the district court, the original trial judge who decided the case had retired. In its January 30, 2014 judgment on remand, the new trial judge concluded "that only those specific documents presently included in Trial Exhibit 17 - Beaumont Bone & Joint Institute records were properly introduced and filed into evidence and any records, reports, or other documentary evidence from Dr. Talbert not specifically and presently included in Trial Exhibit 17 - Beaumont Bone & Joint Institute records were not introduced and filed into evidence." The trial court denied the request to supplement the record with the two medical reports. The two referenced narrative reports are not contained in Exhibit 17 and, therefore, are not properly before this court and cannot be considered.

9

However, this court is not constrained from considering the remaining medical records of Dr. Talbert from the Beaumont Bone & Joint Institute that are part of the record and were filed in evidence in Plaintiff's Exhibit 17 and further contained in Plaintiff's Exhibit 18.

Dr. Talbert's October 26, 2006 medical record of his initial appointment with Mr. Johnson correctly summarizes Mr. Johnson's medical history involving his right knee, the ongoing MRSA infection, and Dr. Foret's prior treatment. Dr. Talbert's history includes the last procedure performed by Dr. Foret on October 17, 2006, which was irrigation and debridement, which left Mr. Johnson with "drains in his knee and an open draining wound."

Dr. Talbert states under the heading of "IMPRESSION: Chronically infected right total knee arthroplasty with failed two-stage revision. The patient currently has open draining wounds." Dr. Talbert's records include a "RECOMMENDATIONS" section, which states:

> I have discussed with him and his daughters today that I do not think this could be treated without removal of the prosthetic components. I would recommend doing that and again putting in antibiotic spacers and treating him with long-term intravenous antibiotic therapy.
>
> After the infection is felt to be controlled, consideration will be then be given to whether another implant could be done or whether he should consider arthrodesis[4] of his knee. They are in agreement with this plan. We are going to have him be admitted Monday for prosthesis removal.

Dr. Talbert's Operative Report gives the details of the surgical procedure he performed on Mr. Johnson on October 30, 2006, and states under the following headings:

**PREOPERATIVE DIAGNOSIS:**
Infected right total knee arthroplasty.

---

[4] An arthrodesis is a fusion of the knee.

**POSTOPERATIVE DIAGNOSIS:**
1.      Infected right total knee arthroplasty.
2.      Disruption extensor mechanism right knee.

**TITLE OF PROCEDURE:**
1.      Irrigation and debridement of the right knee with removal of prosthetic component and insertion of antibiotic spacers.
2.      Patellectomy[5] right knee.

The surgical procedure performed by Dr. Talbert is contained under the heading "**DESCRIPTION OF PROCEDURE**[.]" Dr. Talbert removed the drains and opened Mr. Johnson's knee to reveal that "The patella had significant necrotic material present with minimum bone remaining. Therefore, a Patellectomy was performed and the patellar tendon debrided. Obvious necrotic material was removed. Cultures were taken and sent to the laboratory."

Dr. Talbert then removed the prosthesis, and the knee was debrided, irrigated, and antibiotic spacers were placed between the tibia and the femur. "Two large bore drains were inserted."

On November 7, 2006, Mr. Johnson was discharged from the hospital by Dr. Talbert. Dr. Talbert's Discharge Summary states as follows:

**FINAL DISCHARGE DIAGNOSIS:**
1.      Infected right total knee arthroplasty.
2.      Acute blood loss anemia.

**FOLLOW UP:**
Patient is discharged to home. He has arrangements for home IV antibiotic therapy and outpatient hyperbaric oxygen therapy. He will be seen in the office in about a week.

Following his discharge from the hospital subsequent to his surgery, Mr. Johnson continued to see Dr. Talbert and Dr. Schaening for treatment of his knee infection and monitoring of his condition. On February 8, 2007, Dr. Talbert's records show that Mr. Johnson is three months post-surgery, and "There are no

---

[5] A patellectomy is the removal of the patella.

11

signs of inflammation with the knee." Further, "At this point he is showing no signs of active infection."

At this juncture, Dr. Talbert referenced Mr. Johnson's pending afternoon appointment with Dr. Schaening. Dr. Talbert also indicated that Mr. Johnson had seen Dr. Thompson during his appointment with Dr. Talbert to discuss fusing his knee and he had agreed to have this procedure done by Dr. Thompson once Mr. Johnson had been cleared for surgery by Dr. Schaening and Mr. Johnson was ready to schedule the surgery.

Dr. Talbert's medical records contained in the record in Plaintiff's Exhibits 17 and 18 should have been considered by the trial court, as they provide support for the opinions of the other experts and the medical review panel that the infection suffered by Mr. Johnson had not resolved either before or after any of the multiple surgical procedures performed by Dr. Foret, including two total knee replacement procedures, all of which resulted in Mr. Johnson's damages. We find merit in Mr. Johnson's first assignment of error that the trial court did not properly consider the findings of Mr. Johnson's treating orthopedic surgeon, Dr. Talbert.

### Assignments of Error Two, Three, and Four

This court finds that errors two and three are subsumed into error four. In error four, Mr. Johnson urges the trial court erred in concluding that Dr. Foret complied with the applicable standard of care in his treatment of Mr. Johnson. For the following reasons, we find this assignment error also has merit.

12

**Record Evidence Supporting Dr. Foret's Breach of the Standard of Care Thereby Causing Mr. Johnson's Injuries.**

*Dr. William L. Overdyke – Board-certified Orthopedic Surgeon*

Dr. Overdyke is a board-certified and renowned orthopedic surgeon from Shreveport, Louisiana. He reviewed all of Mr. Johnson's medical records, including all the laboratory work preceding the December 22, 2005, total knee replacement surgery with prosthesis performed by Dr. Foret.

In his March 5, 2007 letter opinion to Mr. Johnson's attorney, John Hammons, Dr. Overdyke specifically details his review of the medical records of Mr. Johnson beginning on October 17, 2005. Dr. Overdyke's opinion letter states in pertinent part:

> The next notes are hospital notes than began on 10-17-05 with an arthrotomy, irrigation and debridement. Mr. Johnson was already on antibiotics at that point. Cultures were negative. Follow-up laboratory began on October 20 with a sedimentation rate of 85 with normal being less than 10. He had multiple sedimentation rates as follows: On 10-27, his SED rate was 30, white court was 11.3, which is elevated. On 11-15 his SED rate was 77, white blood count was 10.6. On 11-30 his SED rate was 61. On 12-7 his SED rate was 42. The last recorded SED rate in these records was 12-13, his SED rate 30. He had a culture done on December 7 which again grew a methicillin resistant Staph aureus. He had an MRI obtained on 11-14-05 that was consistent with septic arthritis. Subsequently, he underwent a primary right total knee replacement on December 22, 2005.

In his September 21, 2010 affidavit, Dr. Overdyke reprises his opinion from his earlier March 5, 2007 letter opinion to counsel. Dr. Overdyke clearly states that Dr. Foret's decision to perform total knee replacement surgery on Mr. Johnson in December 2005 was below the standard of care and resulted in all of the subsequent medical procedures Mr. Johnson was forced to undergo. Dr. Overdyke's affidavit states in pertinent part:

> In review of the course of lab work including SED rates, positive cultures, an MRI consistent with septic arthritis, I believe it

was ill advised to proceed with a total knee replacement in the face of an active infection, which all evidence pointed to. Again, to clarify my position, I believe that a right total knee replacement performed in the face of overwhelming evidence of an active infection in the right knee was below medical standards.

The remainder of Mr. Johnson's medical problems including the necessity for re-operation, revision, and ultimately probably a fusion of his right knee is a direct result of the initial infection as a result of the procedure done on December 22, 2005.

*Opinion of the Medical Review Panel Consisting of Three Board-Certified Orthopedic Surgeons*

The medical review panel consisted of three board-certified orthopedic surgeons, Dr. Michael Acurio, Dr. J. David DeLapp, and Dr. Bryan Frentz. The panel concluded that Dr. Foret breached the standard of care in operating on Mr. Johnson's knee in the face of a documented infection. The panel members noted in its written reasons for the opinion that:

The patient, Terry Lee Johnson, Sr., presented with infection of the right knee prior to total right knee replacement. The culture of 12/7/05 was positive for MRSA with SED rate of 42. No other cultures were ordered prior to the 12/22/05 surgery.

From a review of the records, the panel concluded that the infection was not cleared at the time of surgery, since no follow-up culture and lab work was done to demonstrate that reasonably the infection had cleared and immediate post-op infection ensued. It is the opinion of the panel that Dr. Foret should not have gone forward with the surgery until the infection was demonstrated to be cleared. For this reason, the panel finds that Dr. Foret failed to adhere to the appropriate standard of care and that Dr. Foret's failure to do so is the cause of petitioner's damages.

In addition, the signed affidavits of the three panel members were submitted into evidence. All three physicians attested in pertinent part:

I served on the medical review panel that considered the evidence submitted in this matter and after due consideration of all the evidence including joint discussions with the other panelists, I and the other panelists unanimously concluded that the evidence supports the conclusion that the defendant, Dr. Lynn E. Foret, did not adhere to the appropriate standard of care, and the damages complained of by the

14

petitioner were caused by negligent care or failure to adhere to the appropriate standards of care by the defendant.

*Dr. Orlando Schaening – Mr. Johnson's Board-Certified Infectious Disease Specialist*

Dr. Foret referred Mr. Johnson to Dr. Schaening, an infectious disease specialist in Beaumont, Texas, for an evaluation of his "Right prosthetic knee infection." Dr. Schaening saw Mr. Johnson on October 25, 2006, and found that he did indeed have a "Prosthetic right knee infection." Under the heading "PLAN," Dr. Schaening indicated that he discussed with Mr. Johnson at great length "about treatment and management of this kind of infection." Dr. Schaening also talked with Dr. Foret and "suggested removal of the prosthesis followed by six weeks of intravenous antibiotics. An antibiotic impregnated spacer should be considered at the time of the joint removal surgery."

Once the course of antibiotics was complete, Dr. Schaening suggested that Mr. Johnson undergo an observation period of two weeks. If no signs of infection were present after the two week period, Mr. Johnson should undergo "another aspiration of the knee for culture." If the culture was negative, Dr. Schaening thought that Mr. Johnson could undergo another knee replacement surgery. However, Dr. Schaening suggested that a repeat culture be taken at the time of the latter surgery, and "If the cultures are positive then he should have six months of oral antibiotics."

Dr. Schaening's consultation report is filed in the record and provides in pertinent part as follows:

> **Physical Examination:**
> He has no fever and does not look toxic. However, there is diffuse swelling of the right knee. He has three drains in place and the surgical wound is open at the center. There is significant purulent drainage at the time of my exam.

**Impression:**
Right prosthetic knee infection. I had a long conversation with the patient and his daughters about this problem. They were told that at this point in time I do not know whether he is a candidate for another replacement surgery. However, the first step is to eradicate this infection is to remove the infected hardware. Then we have to analyze his bone stock and determine whether he needs fusion or if he can tolerate another prosthesis.

**Plan:**
They did not want to go back to Dr. Foret if this could be avoided. They asked me if I could contact another surgeon. Therefore, I contacted Dr. Ronald Talbert and explained the situation to him. Dr. Talbert will see Mr. Johnson over the next few days. Appointment with me in one week.

Since Mr. Johnson did not want to continue to see Dr. Foret, an appointment was made for him to see Dr. Talbert. Dr. Talbert saw Mr. Johnson on October 26, 2006, and scheduled him for surgery to remove the infected prosthesis on October 30, 2006. Dr. Talbert asked Dr. Schaening to consult after the surgery, and his consultation report reflects the following plan of treatment for Mr. Johnson post-surgery:

**PLAN:**
Secondary to the patient's bone necrosis and surrounding tissue necrosis, hyperbaric will be advantageous for this patient. The patient will also continue IV antibiotics and has IV antibiotic feeding in place at the surgical site. We will follow the patient along for wound care and hyperbaric treatments. The patient states that he has stopped smoking and will seek assistance if this begins to be a problem for him.

*Dr. Ronald Talbert – Mr. Johnson's Board-Certified Orthopedic Surgeon*

We have previously discussed Dr. Talbert's medical records detailing his care and treatment of Mr. Johnson in *Assignment of Error One*.

*Dr. Daniel Thompson – Mr. Johnson's Other Board- Certified Orthopedic Surgeon*

16

On October 30 2007, one year after Dr. Talbert's successful surgery and after he and Dr. Schaening had successfully cleared all infection, Dr. Daniel Thompson, a board-certified orthopedic surgeon with a specialty in cases such as Mr. Johnson's, in consultation with Dr. Talbert and Dr. Schaening, operated on Mr. Johnson. Dr. Thompson debrided and irrigated the area including the bone of the tibia and femur, removed the non-biodegradable antibiotic beads, and fused Mr. Johnson's right knee. In follow-up on April 14, 2008, Dr. Thompson's records indicated that Mr. Johnson was five-and-a-half months removed from the knee fusion. The records showed that his right knee was well healed and that he was able to walk without significant difficulty, but with the use of a cane.

*Dr. Foret's Office Records*

Dr. Foret did not testify at trial in his own defense. Instead, his attorney submitted Dr. Foret's office records into evidence, as well as the hospital records. However, a review of the records submitted by Dr. Foret confirms the findings of Dr. Overdyke and the medical review panel that "The culture of 12/7/05 was positive for MRSA with SED rate of 42. No other cultures were ordered prior to the 12/22/05 surgery." The failure of Dr. Foret to clear the infection in Mr. Johnson's right knee prior to his first knee replacement surgery was the initial breach of the standard of care by Dr. Foret, as unanimously found by the medical review panel and Dr. Overdyke. Dr. Foret's records clearly demonstrate that he performed the December 22, 2005 total right knee replacement with prosthesis without clear evidence that the infection had cleared.

Further, Dr. Foret's office records and the hospital records continue to document the presence of the MRSA infection throughout Dr. Foret's treatment of Mr. Johnson from December 2005 through October 2006. Dr. Foret's narrative of

17

June 2006 documents the multiple surgeries undergone by Mr. Johnson in an attempt "to clear this infection from his right knee." These include the one in Shreveport and the four performed by Dr. Foret. Dr. Foret's narrative further states, "This patient will need to have at least one more surgery to replace the total knee prosthesis. The patient only has a methyl mathacrylate spacer in his right knee that is not permanent."

Dr. Foret performed yet another total knee replacement with placement of a prosthesis in Mr. Johnson's still infected knee in September 2006. He also performed an incision and debridement in October 2006. Dr. Foret's own records clearly show that the infection was never cleared by Dr. Foret, not before his first procedure in December 2005 or after his last procedure in October 2006. When Dr. Foret referred Mr. Johnson to Dr. Schaening, the infection was still present, as confirmed by both Dr. Foret's and Dr. Schaening's records.

We find no support in Dr. Foret's medical records for the trial court's ruling that Dr. Foret did not breach the standard of care in his treatment of Mr. Johnson.

*Dr. Michael McGuire – Dr. Foret's Expert Orthopedist*

Dr. Michael McGuire, an orthopedist from Nebraska, submitted an affidavit on behalf of Dr. Foret as follows:

> In analyzing the facts that I obtained from my review of the medical records of Terry Lee Johnson in light of my education, training and experience, it is apparent that Terry L. Johnson became disabled by osteoarthritis of the right knee and underwent right total knee arthroplasty in December of 2005. The procedure was performed despite a history of a right knee prepatellar bursal infection in October of 2005. That infection was appropriately treated by Dr. Foret. The decision to proceed to total joint arthroplasty was made after calculation of the risk versus benefits ratio. I am confident from my review of the records that Dr. Foret understood and fully explained the risk involved. Because of the severity of his pain, Mr. Johnson chose to accept those risks and to proceed with surgery in an effort to overcome his disability. I disagree with the statement that the

decision to proceed with surgery was made in the face of overwhelming evidence of a septic knee. Unfortunately, as noted above, Mr. Johnson's total knee arthroplasty was complicated by post-operative infection.

For the reasons outlined above, and based upon my analysis of the medical records provided in light of my education, training and experience, it is my opinion that Lynn Foret, M.D. did adhere to the appropriate standard of care in his treatment of Terry Lee Johnson under the facts and circumstances of this case and that the patient did not suffer any damage which he would not otherwise have experienced due to any act or failure to act on the part of Dr. Foret.

The trial court relied heavily, if not exclusively, on the affidavit from Dr. Michael McGuire in its reasons. Dr. McGuire apparently ignored the laboratory findings of MRSA infection in Mr. Johnson's right knee, a septic knee shown on the MRI, and the cultures showing the continued presence of infection prior to Mr. Johnson's total knee replacement surgery performed by Dr. Foret in December 2005.

Instead of facts from the medical records, Dr. McGuire relied on his unsupported opinion that Dr. Foret "fully explained" the serious risks inherent in operating on an infected knee to Mr. Johnson, and the risks associated with placing a knee replacement prosthesis in a severely infected knee. Dr. McGuire, without any evidence in the record to back up his statement, then opined that Mr. Johnson voluntarily accepted the risks "because of the severity of the pain" and elected to proceed with the surgery "in an effort to overcome his disability." Mr. Johnson's "informed consent" form is in the record and fails to mention anything about the particular risks of performing a total knee replacement with insertion of prosthesis in a severely infected knee.

Mr. Johnson's deposition and his wife's affidavit also directly contradict Dr. McGuire's unsupported opinion of *Mr. Johnson's* understanding of the risks and need for the initial December 2005 knee replacement surgery. Yet, the trial court

failed to mention Mr. Johnson's deposition or Mrs. Johnson's affidavit in its reasons for judgment, nor did it even discuss or mention the overwhelming evidence in the medical records that Dr. Foret operated on a septic knee.

A review of Mr. Johnson's pre-trial deposition that was filed in the record fails to demonstrate a true understanding and appreciation by Mr. Johnson of the actual risk of severe continued infection following total knee replacement with the insertion of a prosthesis in an already infected knee.

> **Q. Okay. All right. And I'm not trying to, you know, make you guess a date; but I mean, how did it come up? Did Dr. Foret bring it up to you or . . .**
>
> A. Yes, Dr. Foret brought it up to me, yes.
>
> **Q. What do you recall him telling you?**
>
> A. Well, my knee was pretty - - pretty well messed up and that it would be better to have it taken out because it was - - it was pretty - - pretty messed up on the inside. I'd have been better off with getting a new knee replacement. *So, I left it up to him - -*
>
> **Q. All right.**
>
> A. - - for that.
>
> **Q. Were you involved in the decision-making process as to when to do it?**
>
> A. I don't know. I don't - - I don't know that.
>
> . . . .
>
> A. Yeah. I think the way he said it, we would - - you know, he'd put it in there and I could be back to work and that's what I wanted to do was go back to work.
>
> . . . .
>
> **Q. Did you-all at that time discuss the fact that infection was a possibility, especially since you had already been treated for an infection in the fall?**

A. I don't know. I can't - - couldn't tell you. I don't know.

**Q. Okay. In the document that you signed, did you understand that infection was a possibility from the surgery?**

A. Well, I knew there was - - there was - -

**Q. A risk?**

A. Yeah.

Mrs. Karen Johnson's affidavit stated:

**Terry went to see Dr. Foret in October 2005 for treatment of his still infected leg. Terry was told that he needed a total knee replacement by Dr. Foret and agreed to have the procedure done. However, if we had known that there was still an active infection and this would lead to further complications and the lost use of Terry's right knee joint we certainly would not have consented to this operation.**

(Emphasis added.)

Despite the overwhelming evidence in the record of the breach of the standard of care in Dr. Foret's treatment of Mr. Johnson, the trial court concluded in part:

Upon weighing all the evidence presented, the Court finds the Dr. Foret's evidence more credible. It is the Court's opinion that Mr. Johnson was well aware of the inherent risk of infection, but because of the severe pain, and his desire to return to work he chose to proceed with the surgery.

In light of Mr. Johnson's continuing knee problems, Dr. Foret with Mr. Johnson's consent took a calculated risk to resolve the severe pain of his patient. The Court finds the plaintiff has not shown by a preponderance of the evidence that Dr. Foret's standard of care reached a negligent level.

In applying the manifest error standard of review, we find that the trial court erred in its conclusion that Mr. Johnson knew, understood, and accepted the risks involved in allowing Dr. Foret to operate on his seriously infected right knee and

introduce into that infected knee a foreign body in the form of a prosthesis. All experts, except Dr. McGuire, whose opinion is not supported by the record, agreed that Dr. Foret breached the standard of care and that breach was the cause of Mr. Johnson's damages.

Although Mr. Johnson may have been understandably anxious to resolve his knee problem and thereby relieve his pain, Dr. Foret, as determined by at least four other board-certified orthopedic surgeons, and as supported by the medical evidence in the record, was bound by the standard of care to postpone the knee replacement surgery until there was a resolution of the MRSA infection. There was no indication in the record that if Dr. Foret had postponed the December 5, 2005 surgery until after the infection had cleared, that delaying this elective surgery would have resulted in an unreasonable danger to Mr. Johnson's health or caused him further harm.

To the contrary, all the medical evidence in the record clearly demonstrates that Dr. Foret's decision to proceed to perform this elective procedure while the knee was still infected did actually cause substantial harm to Mr. Johnson. The standard of care for an *elective* procedure requires that the patient be in the best possible medical condition to tolerate the stress and trauma which is inherent in a surgical procedure. *In Re Dunjee*, 10-1217 (La.App. 4 Cir. 1/26/11), 57 So.3d 541.

Likewise, there is no evidence in the record demonstrating that an emergency situation existed which *required* Dr. Foret to operate on Mr. Johnson on December 22, 2005 without first clearing the infection in his right knee. While a patient may give informed consent to a risky emergency surgery, a patient cannot give informed consent to medical malpractice. A physician must heed his

22

Hippocratic Oath, "I will prescribe regimens for the good of my patients according to my ability and my judgment and *never do harm* to anyone."

This court does not agree with the conclusion of the trial court that Dr. Foret did not breach the standard of care by operating on Mr. Johnson's knee because Mr. Johnson acquiesced to a knee replacement procedure that on its face was below the standard of care required by Dr. Foret. In its ruling, the trial court completely ignored the deposition testimony of Mr. Johnson, the affidavit of his wife, as well as the affidavits of four expert Louisiana board-certified orthopedic surgeons, the medical records of Dr. Foret, the hospital, and the medical records of Mr. Johnson's treating physicians in Texas, Dr. Talbert, Dr. Thompson, and Dr. Schaening. We find that the trial court committed manifest error in its ruling and hereby reverse its judgment of October 10, 2012 in favor of Dr. Foret.

## DAMAGES

We now address the issue of damages based on our finding that Dr. Foret breached the standard of care in his medical treatment of Mr. Johnson and that his subsequent injuries were the result of that breach. In *Robicheaux v. Adly*, 02-37, p. 19 (La.App. 3 Cir. 6/12/02), 827 So.2d 429, 441, *writ denied*, 02-2783 (La. 2/7/03), 836 So.2d 100) (quoting *Craven v. Universal Life Ins. Co.*, 95-1168, pp. 16-17 (La.App. 3 Cir. 3/6/96), 670 So.2d 1358, 1367, *writ denied*, 96-1332 (La. 9/27/96), 679 So.2d 1355), this court stated:

> Where a fact finder does not reach an issue because of an "earlier" finding which disposes of the case, the appellate court, in reversing the earlier finding, must make a *de novo* determination of the undecided issues from the facts in the record. *Lasha v. Olin Corp.,* 625 So.2d 1002 (La.1993); *Austin v. Fibrebond Corp.,* 25,565 (La.App. 2 Cir. 2/23/94), 638 So.2d 1110, *writ denied,* 94-1326 (La.9/2/94), 643 So.2d 149.

23

We have conducted a complete review of the record before us. We find, and the record supports, that Mr. Johnson underwent multiple unsuccessful surgical procedures by Dr. Foret, none of which alleviated his pain and discomfort. The failed surgeries resulted in significant damage and deterioration to his right knee requiring a Patellectomy and ultimately, a complete fusion of his right knee. As a result of the surgical fusion to Mr. Johnson's right knee, he is totally and permanently disabled from his previous employment as a painter/sandblaster/truck driver and has a continuing risk of osteomyelitis with the need for future medical care.

Mr. Johnson's related medical expenses total an undisputed $331,562.49. Mr. Johnson also seeks an award of $500,000.00 for loss of earnings, future loss of earnings and earning capacity, and an award of general damages in the amount of $750,000.00. The record before us supports a finding that Mr. Johnson has a serious disability, a fused right knee, but has no real evidence of past or future economic loss. Moreover, except for future medical expenses, the damages claimed are in excess of the statutory cap of the Medical Malpractice Act, La.R.S. 40:1299.42(B). Though Mr. Johnson's injuries and pain and suffering may justify a substantial award, the Louisiana Supreme Court in *Oliver v. Magnolia Clinic*, 11-2132, 11-2139, 11-2142 (La. 3/13/12), 85 So.3d 39, reiterated its holding in *Butler v. Flint Goodrich Hospital of Dillard University*, 607 So.2d 517 (La.1992), *cert. denied*, 508 U.S. 909, 113 S.Ct. 2338 (1993), which found the medical malpractice cap constitutional. Any award for general damages and loss of earnings and earning capacity is limited to $500,000.00 pursuant to La.R.S. 40:1299.42(B)(1), "exclusive of future medical care and related benefits as provided in R.S.

24

40:1299.43." Dr. Foret is a covered health care provider whose liability is limited to $100,000.00, pursuant to La.R.S. 40:1299.42(B)(2).

"Future medical care and related benefits" are defined under La.R.S. 40:1299.43(B)(1)(a) & (b). Section (a) states as follows, "All reasonable medical surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, incurred after the date of the injury up to the date of the settlement, judgment, or arbitration award." Section (b) provides for all of the above, but covers the period from "after the date of the injury that will be incurred after the date of the settlement, judgment, or arbitration award."

In accordance with the supreme court's decisions in *Oliver* and *Butler*, future medical expenses can only be claimed against the LPCF. Thus, the LPCF would have been responsible for all of Mr. Johnson's medical bills totaling $331,562.49, plus any additional medical bills in the future that are medically related to the malpractice of Dr. Foret, payable in accordance with the statute. La.R.S. 40:1299.43(B)(1)(b). As previously noted, however, Mr. Johnson settled his claims against the LPCF, and the settlement documents are not in evidence. Hence, we express no opinion on whether any further sums are or may be owed to Mr. Johnson by the LPCF. Thus, Mr. Johnson's claim against Dr. Foret is limited to $100,000.00, plus legal interest from the date of judicial demand and all court costs. La.R.S. 40:1299.42(B)(2).

## CONCLUSION

For the forgoing reasons, the judgment of the trial court in favor of Lynn E. Foret, M.D., finding that he did not breach the standard of care in his treatment of Mr. Terry Lee Johnson, Sr. and cause his subsequent injuries, is reversed. Based on

25

the record before this court, pursuant to the provisions of the Medical Malpractice Act, La.R.S. 40:1299.42(B)(1) & (2), and considering Mr. Johnson's settlement with the LPCF, we hereby award damages in favor of Mr. Terry Lee Johnson, Sr. and against Lynn E. Foret, M.D., in the amount of $100,000.00, plus legal interest from March 19, 2007, the date of judicial demand until paid, plus all court costs. All costs of this appeal are assessed against Lynn E. Foret, M.D.

**REVERSED AND RENDERED.**

**GREMILLION, J., dissents.**

The majority ignores the manifest error standard of review in order to reach the conclusion it deems more reasonable. First, rather than noting the manifest error standard of review, the majority spends several pages attempting to "reconcile" some issue regarding summary judgments despite the fact that there is no summary judgment at issue here. Furthermore, no appellate court in this state, nor the supreme court, has ever identified such a need for reconciliation.

The trial court was tasked with determining whether Dr. Foret breached the applicable standard of care. Instead of reviewing the testimony of the witnesses who addressed this question, the majority examined page after page of medical records from health care providers who never answer the question; that is, they never opine that Dr. Foret breached the applicable standard of care.

For example, the majority exhaustively recites the medical records of Dr. Ronald E. Tolbert. However, Dr. Tolbert's opinion as to whether Dr. Foret breached the applicable standard of care is not found in the record. The majority tries to sanitize that fact by pointing out that Dr. Tolbert's opinion was "obviously intended to have been filed into evidence."

The majority goes through the medical records of Dr. Orlando Schaening to try to answer the question "Does Dr. Schaening believe that Dr. Foret breached the

applicable standard of care?"  We obviously cannot know, as his answer to that question is not expressed in his records.

What about Dr. Daniel Thompson?  Again, the majority thoroughly reviews Dr. Thompson's records.  However, this record does not contain Dr. Thompson's opinion as to whether Dr. Foret breached the applicable standard of care.

When all of this clutter is cleared away, the record contains the opinions of four doctors (Dr. Michael Acurio, Dr. J. David DeLapp, Dr. Brian Frentz, and Dr. William L. Overdyke) who were asked the proper question.  Those four doctors clearly opined that Dr. Foret breached the applicable standard of care.  But it is well established that "witnesses are weighed and not counted, and the weight to be given evidence is not determined by the number of witnesses."  *Duhon v. Slickline, Inc.*, 449 So.2d 1147, 1151 (La.App. 3 Cir.), *writ denied*, 452 So.2d 172 (1984).  The court of appeal is not entitled to reverse the trial court's opinion merely because it would have weighed the evidence differently.  *Sistler v. Liberty Mut. Ins. Co.,* 558 So.2d 1106  (La.1990).

The last step in the majority's long trip around manifest error is to attack the evidence that requires that we affirm the trial court.  There is absolutely nothing in the record before us that would render the opinion of Dr. Michael McGuire, a board-certified orthopedist, any less competent or credible than the other doctor witnesses.  Dr. McGuire opined that Dr. Foret "did adhere to the appropriate standard of care."  The majority repeatedly disparages Dr. McGuire's opinion as being from out of state, as being relied upon too heavily, and as being "unsupported."  Ironically, however, the majority relies heavily on experts who, in fact, provide no opinions at all, be they "unsupported" or otherwise.

2

"When the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusions on this issue will be granted great deference. It is the sole province of the factfinder to evaluate the credibility of such experts and their testimony." *Charpentier v. Lammico Ins. Co.*, 606 So.2d 83, 87 (La.App. 3 Cir. 1992).

The majority does not like it, but this is the essence of the manifest error standard of review. The trial court was clearly within its province when it found Dr. McGuire's expert opinion more credible than those of the other experts who provided the necessary opinions. I, therefore, would affirm the trial court, and I respectfully dissent.